**Charles ROESLIN, III, Plaintiff,**

**v.**

**DISTRICT OF COLUMBIA, Defendant.**

**Civil Action No. 92–1493 (HHG).**

United States District Court,
District of Columbia.

April 7, 1995.

Joseph Vincent Colaianni, Sr., Melissa Lanni Robertson, Peter D. Vogl, Pennie & Edmonds, Washington, DC, Brian James Hundertmark, I, Roberts & Hundertmark, Chevy Chase, MD, for plaintiff.

Jack M. Simmons, III, Office of Corporation Counsel, Washington, DC, for defendant.

## OPINION

HAROLD H. GREENE, District Judge.

In this action, plaintiff, an employee of the Department of Employment Services ("D.O.E.S.") of the District of Columbia, claims copyright infringement against the District for its use and copying of a computer software program (the "DC–790" system) that plaintiff developed. The matter was tried, and it is now ripe for these findings of fact and conclusions of law.

### Findings of Fact

D.O.E.S. is responsible for collecting and tabulating employment statistics for the District of Columbia and the D.C. metropolitan area. It collects the statistics by mailing the Current Employment Service ("CES") survey to area employers, and tabulating their responses. D.O.E.S. transmits these statistics and estimates based thereon to the Federal Bureau of Labor Statistics ("BLS") for its use in computing national labor statistics.

Plaintiff was hired by D.O.E.S. in November, 1986 for the position of a Labor Economist for a four year term, and began work in the Labor Management Information Section of D.O.E.S. He received a salary from the District and full benefits. At the time plaintiff was hired, he had no computer programming skills, nor was his supervisor, Mr. Groner, aware of whether plaintiff had any computer programming skills.

As a Labor Economist, plaintiff was charged with three tasks: (1) to improve employer response rate to the CES survey; (2) to expand the CES sample size; and (3) to develop industry and occupational employment projections. His job description listed his duties as: (1) planning and carrying out projects for collecting detailed economic data; (2) evaluating and adapting necessary statistical methods for the preparation of data; (3) planning, organizing and operating programs (i.e. projects) for the collection, verification and presentation of data; (4) selecting the most appropriate statistical methods; (5) preparing estimates of employment and unemployment; and (6) preparing various reports and studies. He had discretion in determining how to carry out these duties.

When plaintiff began working at D.O.E.S., employees manually collected the information from returned CES surveys and recorded the information on office record cards. A data processing staff would enter this data into the mainframe system. The estimates derived from this data were computed manually with the aid of a computer. The District anticipated the future development of the Automated Current Employment Statistics ("ACES") mainframe system.

Prior to developing the DC–790 system, plaintiff did use a computer to assist in the carrying out of his duties, although he did not do any computer programming.[1] Plaintiff also assisted in the "automation" of the office, that is, in transferring some of the work that was done manually to already existing computer software applications. This task also did not involve any computer programming.

Plaintiff was motivated to create the DC–790 system in June 1988 when he attended a CES conference. Upon returning from the conference, plaintiff informed his supervisor, Mr. Groner, that he believed a personal computer ("PC") based system could be created for the District's CES surveys. Plaintiff testified that after checking with BLS, Mr. Groner informed plaintiff that creation of a

---

1. Computer programming is a technical skill that involves adding "source code" in a computer language. Source code is a series of language specific commands ordered in a logical series to produce a specific result. Computer programming is the method by which computer software applications are created. Using computers and computer software is not the same as programming computers, as defense witnesses conceded at trial.

PC-based program was neither feasible nor desirable, and told plaintiff not to pursue the idea because he would be too busy with his other job duties, and because D.O.E.S. had already decided to eventually implement ACES, the mainframe system.[2] Nonetheless, plaintiff informed Mr. Groner that he would create a PC-based system on his own time. Plaintiff testified that his motivation in creating the program was to prove that it could be done and to develop job opportunities for himself. Mr. Groner told the plaintiff that the program would be "in the public domain," which plaintiff took to mean that the system would not be owned by anybody. Mr. Groner actually believed that the District would own the program; he testified that he thought that the phrase "in the public domain" meant that the District would own the program.

In August 1988, plaintiff purchased a personal computer with his own funds. In October 1988, he purchased software using his own funds. Plaintiff taught himself how to program computers using books that he purchased with his own funds.[3] He spent approximately 3,000 hours creating the various modules necessary to complete the DC–790 program, and creating enhancements to the system. He completed the final module in January, 1991, although most of the modules were completed by 1990. Plaintiff did all of this work at home. He also tested each module at home, using hypothetical data. Nobody at D.O.E.S. directed plaintiff to create the DC–790 system, supervised his doing so, or assisted him in doing so. He was not offered compensation for the creation of the system.

After testing each module at home, plaintiff brought each module into work to test with actual data. Some of the testing and debugging of various modules was done during office hours. Once each module worked properly, plaintiff incorporated the modules into the PC system operating at D.O.E.S. Shortly after the DC–790 system became operational, D.O.E.S. personnel ceased using office record cards. Plaintiff also created an operating manual for the DC–790 system in May 1990 in response to a request by an employee of the BLS Regional Office. Plaintiff received positive performance appraisals based, in part, on his development of the DC–790 system. Prior to April 1991, plaintiff attempted to promote the DC–790 system to BLS, and demonstrated the system to some of its personnel during office hours.

Throughout this period, according to plaintiff's testimony, he relied on Mr. Groner's statement to him that nobody would own the DC–790 system and that it would be in the public domain. Plaintiff stated that he first learned that the District asserted a proprietary interest in the program in April of 1991. At that time, he was provided with a copy of a letter from the District to the State of Maine, in which the District stated that it had a proprietary interest in the program. Defendant does not dispute that this is when plaintiff first learned that defendant asserted a proprietary interest.

When plaintiff learned that the District claimed a proprietary interest in the DC–790 system, he confronted Mr. Groner. He told Mr. Groner that if anyone owned the system (rather than it being in the public domain), then he did, as the author of the program. Plaintiff and Mr. Groner met to discuss the issue, at which time plaintiff requested recognition by the District that he had independent ownership of the program, in exchange for which the District would be allowed free use and distribution of the software. He also requested a promotion.

2. Mr. Groner testified that the only thing he recollected telling plaintiff was that creating a PC-based system could not be done. However, he did not dispute plaintiff's testimony that he made the other statements the plaintiff described.

3. Defendant cites a host of "computer training" seminars that the plaintiff attended on work hours and for which it paid. Apparently, defendant intends to create the impression that it facilitated plaintiff's education in computer programming. This, however, is not the case. Defendant may have improved plaintiff's ability to *use* certain computer software, such as the "Basic Symphony" and "DBase III." On the other hand, defendant did not at all contribute to plaintiff's ability to program computers, or develop computer software, a wholly different skill. *See* n. 1.

In June of 1991, plaintiff placed a copyright notice on the initial screen of the DC–790 system. In June, through counsel, he notified the District's Corporation Counsel and the Mayor's office of his claim of copyright ownership. He also demanded that the District stop using the system. In December of that year, he filed for and received Copyright Registration No. TXu 514 262 for the DC–790 system. The District never filed an application to register a copyright for the system.

Despite plaintiff's notice of copyright ownership, employees of the District continued using the system. Mr. Groner never instructed his employees to cease using the system.

Plaintiff also gave notice that he would make no further modifications to the program if these modifications required programming. From November of 1992 until June or July of 1993, plaintiff was temporarily reassigned to the District's Office of Management, Information and Data Systems. During this time, plaintiff was working under a job description of computer programmer analyst. Plaintiff did not work on the DC–790 system while placed on this assignment. While the DC–790 system was rendered inoperable during this time period, due to an employee error, plaintiff was not asked to assist in correcting the problem.

In November of 1991, the District requested installation of the ACES system. The installation of this system was completed in January 1993. Plaintiff assisted the District somewhat in the conversion from the DC–790 system to the ACES system. He would not participate to the extent that participation would involve his copyright. There was some delay in implementing the ACES system, but according to plaintiff's testimony, some of which was due in no part to plaintiff's behavior, and some of which was due to a combination of plaintiff's standing by his copyright claim and defendant's delay in finding alternate sources of the information it sought from plaintiff.

Based on a study conducted by a D.O.E.S. employee, Ms. Moore, the ACES system costs in excess of $83,000 a year. $59,000 goes to programmers' salaries and $24,000 is attributable to mainframe processing charges. Ms. Moore testified that the DC–790 system did not incur the processing charges or the programmers' salaries.

### Conclusions of Law

#### I

■ The central issue in this case is whether plaintiff, as the author of the DC–790 system, or defendant, as plaintiff's employer, is the owner of the copyright on the DC–790 system. Generally, the author of a work is the owner of a copyright. 17 U.S.C. § 201(a). However, in the case of a "work made for hire," the owner of the copyright is the entity for whom the work was prepared. *Id.* at § 201(b). The copyright statute defines a work made for hire as "a work prepared by an employee within the scope of his or her employment." *Id.* at § 101. Because plaintiff has received a copyright registration for the DC–790 system, the presumption is that plaintiff owns the copyright. 17 U.S.C. § 410(c). The burden is thus on the defendant to establish that the system is a work made for hire. *See, e.g., Avtec Systems Inc. v. Peiffer,* 21 F.3d 568, 571 (4th Cir.1994); *Design v. Lauren Knitwear Corp.,* 782 F.Supp. 824, 829 n. 11 (S.D.N.Y.1991).

The Supreme Court has held that to determine whether an individual was an employee, and whether he created a work within the scope of his employment, courts should look to the general common law of agency. *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 740, 109 S.Ct. 2166, 2172–73, 104 L.Ed.2d 811 (1989). There is no dispute in this case that plaintiff was an employee of defendant. The question is whether he created the DC–790 system within the scope of his employment.

■ The Restatement (Second) of Agency, which the Supreme Court cited in *Reid,* states that:

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is within the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits; [and]

(c) it is actuated, at least in part, by a purpose to serve the master.

Restatement at § 228. The employer must demonstrate that these three of these factors exist to prove that the work is a work made for hire. *See Avtec Systems,* 21 F.3d at 571–72.

■ **A.** With regard to the first prong, the Court finds that developing computer software is not the kind of work plaintiff was employed to perform. Plaintiff was hired as a labor economist, not as a computer programmer. There is no reference in his job description to computer programming; nor was his supervisor aware of whether plaintiff had any programming skills when he was hired. Plaintiff was hired to improve certain aspects of the CES survey and develop projections based on that survey. He was not hired to create a computer program that would assist the entire office and receive, process, and transmit the survey results.

Defendant makes much of the fact that plaintiff used computers at work, and that defendant allowed plaintiff, during work hours, to learn how to use computers. This, however, does not prove that computer programming was part of plaintiff's job duties or necessary to performing his job duties. Many people use computers in the work place, including plaintiff's coworkers, but do not program computers. The two skills are quite different—while many people operate computers, few have the technical ability or training necessary to program them.

■ To be sure, work that is incidental to the conduct authorized by the employer, even if it is not central to the employee's job duties, also falls within the scope of employment. Restatement at § 229. To determine whether computer programming was incidental to plaintiff's employment, a court may consider such factors as whether this was the type of activity commonly done by labor economists, and whether it was likely that plaintiff would engage in such an activity. *Id.* The Court finds that while developing the DC–790 system did help the functioning of the work place, it was not the type of activity in which plaintiff would be reasonable expected to engage.

Moreover, it is disingenuous for the District now to claim that developing the DC–790 system was within the scope of plaintiff's job duties. Plaintiff originally approached Mr. Groner about writing a computer program that would perform the functions of the system. Plaintiff testifies, very credibly, that Mr. Groner discouraged him from doing so, stating that it would detract from his ability to perform his other job duties and that D.O.E.S. had already decided to implement the ACES system. It is unfair for the District to now claim that an activity it discouraged—developing the system—was within the scope of plaintiff's employment.

■ **B.** Second, the Court must determine whether the development of the system "occurred substantially within the authorized time and space limits." The Court finds that it did not. Plaintiff credibly testified that he spent 3,000 hours outside of normal working hours creating the modules of the DC–790 system. He did this at home using a computer he purchased with his own funds. It is true that plaintiff tested each module at work. It is also true that once each module was operational, it was used in the work place. Nonetheless, the substantial amount of time plaintiff spent creating the DC–790 system, which is what is at issue in this case, was done on his own time outside of the office. Accordingly, the system was not developed within the authorized time and space limits.

■ **C.** Finally, the Court will address whether plaintiff was motivated to create the system, at least in part, by a purpose to serve the master. Plaintiff testified that he created the program for two reasons: (1) to create job opportunities for himself; and (2) to prove it could be done. The Court finds that plaintiff was motivated by each of these purposes. To be sure, the DC–790 system benefitted his employer, and the Court could fairly infer that part of plaintiff's motivation was to achieve this result. However, the Court finds that plaintiff was primarily motivated by self-fulfilling purposes. Additionally, it finds, as stated above, that it is disingenuous for the District to initially have stated that the plaintiff could not create the

system, and now assert that plaintiff did so for the District's benefit.[4]

On the whole, then, the Court finds that defendant has not established that the DC–790 system was a work made for hire. The program was not the type of work plaintiff was employed to perform, nor was it incidental to his job duties. Moreover, the substantial proportion of the creating of the program took place outside the office during non-office hours. Finally, the plaintiff was primarily motivated to create the system for his own benefit.

## II

■ To recover in this case, plaintiff must also demonstrate that the District infringed his copyright. There is not much dispute on this issue. Plaintiff must establish that the defendant copied "constituent elements of the work that are original." 17 U.S.C. § 501(a). The placement of a copyrighted program into a computer, or the loading of a copyrighted program into a computer (which occurs every time an employee uses the program), constitutes "copying" the program for purposes of the Copyright Act. *See MAI Systems Corp. v. Peak Computer Inc.*, 991 F.2d 511, 519 (9th Cir.1993), *cert. dismissed*, —— U.S. ——, 114 S.Ct. 671, 126 L.Ed.2d 640 (1994); *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255, 260 (5th Cir. 1988). Thus, every time a D.O.E.S. employee used the DC–790 system, which the employees did up until January, 1993, the District infringed plaintiff's copyright.

## III

■ The District asserts a number of defenses that would defeat plaintiff's claim. It claims that (1) plaintiff is estopped from asserting his copyright, (2) that he abandoned his copyright, (3) that his actions constitute contributory infringement of his copyright, (4) that he granted a non-exclusive license to

use the DC–790 system. These defenses essentially rely on the theory that plaintiff should not be able to assert a copyright when he did not do so prior to April, 1991 and in fact introduced the DC–790 system into the office. However, plaintiff's failure to assert a proprietary interest in the system prior to April 1991 was due to Mr. Groner's representation that plaintiff would not have a proprietary interest. As soon as plaintiff learned that the District was representing to others that it owned the DC–790 system, he immediately stated his proprietary interest and undertook the necessary steps, such as applying for a copyright, to verify that position. Plaintiff reinforced this position by insisting that he would make no modifications on the system until the District admitted that he owned the system. Accordingly, any defense based on plaintiff's failure to state a proprietary interest in the DC–790 system, or his acquiescence to its being used in the office, must fail.[5]

## IV

Upon finding that plaintiff had a copyright in the DC–790 system, and that the defendant infringed that copyright, the Court must assess damages.

First, plaintiff requests that the Court enjoin the District's further use of the DC–790 system pursuant to 17 U.S.C. § 502(a). The Court will do so.

■ Second, plaintiff requests damages in the amount of "profits of the infringer that are attributable to the infringement" pursuant to 17 U.S.C. § 504(b). Costs that the defendant did not incur because it infringed a copyright are considered profits for this purpose. *See, e.g., Deltak Inc. v. Advanced Systems*, 767 F.2d 357, 361–62 (7th Cir.1985); *Nucor Corp. v. Tennessee Forging Steel Service, Inc*, 513 F.2d 151, 152–53 (8th

---

4. The fact that plaintiff created the system to further his own goals distinguishes this case from *Miller v. CP Chemicals, Inc.*, 808 F.Supp. 1238 (D.S.C.1992), relied on by defendants. In that case, the Court was careful to note that "the driving force" behind the employee's behavior was to make the work place more efficient. *Id.* at 1244.

5. The Court further notes that plaintiff is seeking damages only for the period after he notified defendant that he believed he was the owner of the copyright. He is not asserting damages for the entire period that D.O.E.S. used the DC–790 system, which would require the Court to more fully consider whether it was reasonable for plaintiff to rely on Mr. Groner's statement.

Cir.1975). In this case, use of the DC–790 system prevented the District from incurring the cost of the ACES system, which was estimated to be $83,000 a year. The defendant does not dispute that this figure accurately represents the costs associated with the ACES system. Defendant does contend that plaintiff fails to discount for the "imputed costs of the DC–790 system;" however it offers no alternative theory of calculating damages. Plaintiff is thus entitled to recover this cost for the period from which he notified the District that he believed he owned the copyright, April of 1991, until the District ceased using the DC–790 system in December 1992. This amounts to $145,250.[6]

■ Defendant contends that plaintiff is not entitled to the full amount of damages because he failed to mitigate his damages. Essentially, defendant claims that plaintiff contributed to the delay in implementing the ACES system, and thus contributed to the District's failure to stop using the DC–790 system. This argument is unpersuasive. First, and most persuasively, plaintiff offered defendant a royalty-free license to use the system if it would admit that he was the program's owner. The District turned down this offer. Second, the evidence showed that plaintiff assisted, to a certain degree, in implementing the ACES system; he did not assist only to the extent that defendant requested him to do something that he believed was covered by his copyright. Thus, plaintiff did not fail to mitigate his damages and is entitled to the full $145,250.

## V

■ The final issue is whether plaintiff is entitled to attorneys' fees and costs. The Copyright Act provides that "the court in its discretion may allow the recovery of full costs.... [T]he court may also award a reasonable attorney's fee to the prevailing party." 17 U.S.C. § 505. In *Fogerty v.*

*Fantasy Inc.,* 510 U.S. 517, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), the Supreme Court found that this provision does not allow for the awarding of attorney's fees as a matter of course. *Id.* at ——, 114 S.Ct. at 1033. On the other hand, the plaintiff need not prove that defendant acted in bad faith. *Id.* Rather, attorney's fees are to be awarded in the court's discretion; the court may take into account such factors as "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* at —— n. 19, 114 S.Ct. at 1033 n. 19, *quoting Lieb v. Topstone Industries,* 788 F.2d 151, 156 (3rd Cir.1986). Plaintiff cursorily contends that he is entitled to attorney's fees because defendant acted in bad faith when it "deliberately misled" him into thinking the DC–790 system was in the public domain. He provides no further argument on the issue; defendant does not even address the issue.

■ The Court finds that the award of attorney's fees is not appropriate in this case. There was a genuine dispute as to whether plaintiff or defendant was the owner of the copyright. There was evidence supporting each side's contention. The defendant did not act unreasonably in defending this case; it had a colorable claim, albeit one that the Court ultimately rejected, that the DC–790 system was created in the scope of plaintiff's employment.[7]

## VI

For the reasons stated, the Court finds for the plaintiff. An Order is being issued contemporaneously herewith.

---

6. April, 1991 through December, 1992 is 21 months, or 1.75 years. 1.75 × $83,000 totals $145,250.

7. Furthermore, to the extent that defendant's acting in bad faith is relevant, the Court finds that Mr. Groner did not act in bad faith when he misinformed plaintiff as to who would own the

DC–790 system. Mr. Groner testified that he mistakenly believed that the District owned products that are "in the public domain." While this is certainly in error, Mr. Groner is not an attorney and the Court will not find that he acted in bad faith when he made this statement.