**Reginald D. STAGGERS, a/k/a Regstag Music, Plaintiff,**

v.

**REAL AUTHENTIC SOUND, Defendant.**

**No. Civ.A. 96–2805 SSH.**

United States District Court, District of Columbia.

Oct. 28, 1999.

Steven J. Kramer, Washington, DC, for plaintiff.

Joshua J. Kaufman, Washington, DC, for defendant.

## *OPINION*

STANLEY S. HARRIS, District Judge.

Before the Court are defendant's motion for summary judgment, plaintiff's opposition thereto, defendant's reply, and supplemental filings in support of and in opposition to the motion. Upon consideration of the entire record, defendant's motion for summary judgment is granted in part and denied in part. "Findings of fact and conclusions of law are unnecessary on decisions of motions under Rule 12 or 56. . . ." Fed.R.Civ.P. 52(a); *Summers v. Department of Justice*, 140 F.3d 1077, 1079–80 (D.C.Cir.1998). Nonetheless, the Court sets forth its reasoning.

## STANDARD OF REVIEW

Summary judgment may be granted only if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, all evidence and the inferences to be drawn from it must be considered in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Mere allegations in the pleadings, however, are not sufficient to defeat a summary judgment motion; if the moving party shows that there is an absence of evidence to support the non-moving party's case, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## FACTUAL BACKGROUND

Defendant Real Authentic Sound ("RAS"), a record company, paid Harold McLarty, a record producer, to produce a new album re-recording with new music original lyrics from a previously-released album entitled *Mi Name Tiger*. RAS and McLarty allegedly agreed that McLarty was to be solely responsible for acquiring the necessary rights from all artists and for providing RAS with a master tape of the recording. McLarty originally approached Raymond Tilkens, a musician, to compose the new music for the album. Tilkens wrote the music for one song—*Mi Name Tiger*—but was unable to complete the project. Tilkens introduced plaintiff Reginald Staggers, also a musician, to McLarty. Plaintiff and McLarty subsequently contracted to have plaintiff write and arrange the music for the ten remaining songs needed for completion of the album. As part of their agreement, plaintiff was to retain "all Copyrights and Publishing to the music of the aforementioned compositions." Compl., Ex. B, ¶ 4. Plaintiff subsequently wrote, arranged, and performed the musical compositions and delivered the master tape to McLarty for the following songs: (1) *I Tiger*; (2) *No Wanga Gut*; (3) *Progress*; (4) *Move Up*; (5) *Mi Lover Mi Lover*; (6) *Don't Be Greedy*; (7) *No Lef Ya So*; (8) *Man and Woman*; (9) *The Works*; (10) *Bonner Pen Rock*; and (11) *No Puppy Love*.[1] McLarty subsequently gave the master tape to RAS. RAS went on to manufacture and distribute an album entitled *New Brand Style*, containing these eleven songs as well as the song written by Tilkens.

Upon notice that his music allegedly was being distributed without his authorization, plaintiff retained counsel who, by means of a letter dated November 8, 1995, notified RAS that its use of plaintiff's music violat-

---

1. The eleventh song—*No Puppy Love*—was not required by the contract, but was added later.

ed his copyrights. *See* Compl., Ex. G. In the same letter, plaintiff's counsel also suggested that RAS contact him to discuss proper licensing of the music and adequate compensation of plaintiff. *See id.* As a result, RAS and plaintiff's agent (the Harry Fox Agency) negotiated license agreements for eleven of the twelve songs on the album (all of the songs that plaintiff actually composed, thereby excluding *Mi Name Tiger*). Disputes about the proper disbursement of royalties arose between plaintiff and RAS. The disputes were never resolved and this suit followed.

## ANALYSIS

Plaintiff's complaint contains several claims. Plaintiff brings these claims under the Copyright Act of 1976, as amended, 17 U.S.C. §§ 101–1101 (1994 & Supp.1999), and invokes this Court's jurisdiction under 28 U.S.C. § 1338(a) & (b). First, plaintiff claims that RAS knowingly infringed his copyrights by publishing and placing on the market the *New Brand Style* album containing plaintiff's musical compositions "without obtaining Plaintiff's right to use his performances or by paying the appropriate royalties for use of the Compositions." Compl., ¶ 16. This allegation is rather vague and potentially refers to two separate claims: (1) that RAS infringed plaintiff's alleged copyright in the sound recording of the *New Brand Style* album; and (2) that RAS infringed plaintiff's alleged copyrights in the twelve songs on the *New Brand Style* album.[2] Second, plaintiff claims that RAS knowingly signed licenses to reproduce plaintiff's music outside of the United States in violation of the license agreements. Third, plaintiff claims that RAS breached the license agreements by not making adequate royalty payments to plaintiff for the albums that RAS manufactured, distributed, and sold. The Court treats this claim as a contract claim, although plaintiff's complaint improperly labels it a copyright claim.[3]

Defendant's motion for summary judgment is granted with respect to plaintiff's claims that RAS infringed plaintiff's copyrights by: (1) publishing the eleven songs written by plaintiff during the time period that it held a license to do so; and (2) publishing the song *Mi Name Tiger*. The motion is also granted with respect to plaintiff's claim that RAS violated the parties' license agreements by granting foreign companies the right to reproduce the *New Brand Style* sound recording. The motion is denied without prejudice with respect to plaintiff's claims that defendant: (1) infringed plaintiff's alleged copyright in the sound recording of the *New Brand Style* album; (2) infringed plaintiff's copyrights in his musical compositions by distributing the *New Brand Style* album outside of the United States; and (3) breached the license agreements by not paying plaintiff adequate royalties.

■ Protection given to copyrights is entirely statutory and is set forth in 17 U.S.C. § 106. *See Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 300 (8th Cir.1987). Plaintiff has never alleged any public performance by RAS in his complaint, nor in any of the other papers on file with the Court.

2. Plaintiff's allegation that RAS did not obtain the right to "use his performances" may also potentially refer to a claim that RAS infringed plaintiff's performance rights. However, the Court assumes plaintiff did not intend to make this claim, and therefore does not address it, for two reasons. First, neither party discusses this issue in their briefing. Second, plaintiff's complaint does not allege the facts necessary to prevail on an infringement claim based on a violation of performance rights. In order to prevail on such a claim, the copyright owner must prove, *inter alia,* that the defendant publicly performed the composition without any authorization to do so. *See Highfill v. LaSalle Music Publisher, Inc.*, 831 F.2d

3. Plaintiff's complaint also asserts a claim that McLarty wrongfully licensed to RAS the compositions embodying the performance of plaintiff and seeks damages from McLarty. The Court fails to see the relevance of this allegation, as McLarty is not a party to this lawsuit, nor is he an employee of defendant. Therefore, this Court will not further address that argument.

417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). Such protection is limited to exclusive rights held by a copyright owner.[4] *See Stewart v. Abend,* 495 U.S. 207, 220, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). In order to prevail in a copyright infringement action, a plaintiff must show two elements: First, that he is the rightful owner of the copyright at issue, and second, that the defendant infringed his copyright. *See Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Stenograph L.L.C. v. Bossard Assocs., Inc.,* 144 F.3d 96, 99 (D.C.Cir.1998); *Nelson v. Grisham,* 942 F.Supp. 649, 651 (D.D.C.1996).

### A. *Whether RAS Infringed Plaintiff's Copyrights By Publishing and Placing On the Market the New Brand Style Album*

██ Copyright protection extends to two distinct aspects of music: (1) the musical composition, which is itself usually composed of two distinct aspects—music and lyrics; and (2) the physical embodiment of a particular performance of the musical composition, usually in the form of a master recording. 5 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 24.01 (1999). *See also* 17 U.S.C. § 102(a) (1994) (stating that copyright protection extends to "original works of authorship," which include "musical works" and "sound recordings."); *BTE v. Bonnecaze,* 43 F.Supp.2d 619, 627 (E.D.La.1999)

("Sound recordings and the underlying musical compositions are separate works with their own copyrights."); *T.B. Harms Co. v. Jem Records, Inc.,* 655 F.Supp. 1575, 1576 n. 1 (D.N.J.1987) ("When a copyrighted song is recorded on a phonorecord, there are two separate copyrights: one in the musical composition and the other in the sound recording."). Plaintiff claims to own both the copyrights in the musical compositions included on the *New Brand Style* album, as well as the copyright in the *New Brand Style* sound recording itself.[5] As a result, plaintiff claims that RAS's publishing and placing on the market of the *New Brand Style* album infringed both sets of copyrights.

### 1. Whether RAS Infringed Plaintiff's Alleged Copyright in the Sound Recording of the *New Brand Style* Album

As discussed above, plaintiff claims to own the copyright in the *New Brand Style* sound recording, and therefore argues that RAS's use of it constitutes infringement.[6] However, defendant claims that, through McLarty, it owns the copyright to the sound recording, and therefore its use of the recording could not constitute infringement. Defendant has not provided the Court with sufficient information to decide, as a matter of law, that it alone owns the *New Brand Style* sound recording. Accordingly, its motion for summary judg-

---

4. Section 106 prescribes the exclusive rights that attach to a copyrighted work. Included are the rights to (1) reproduce, (2) prepare derivative work, (3) distribute, (4) perform, (5) display, and (6), in the case of sound recordings, perform the copyrighted work publicly by means of a digital audio transmission. *See* 17 U.S.C. § 106 (1994 & Supp. 1999). Because those rights are separate and distinct, and are severable from one another, the grant of one right does not waive any of the other exclusive rights. *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.,* 749 F.2d 154, 158 (3d Cir.1984).

5. Plaintiff actually claims to be co-owner of the copyrights in the musical compositions, as he wrote only the music for the album. The

lyrics were written by Norman Jackson (known professionally as "Tiger") several years earlier.

6. The Copyright Act defines sound recordings as "works that result from the fixation of a series of musical, spoken, or other sounds, but not including the sounds accompanying a motion picture or other audiovisual work, regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied." 17 U.S.C. § 101 (1994 & Supp.1999). Thus, a sound recording copyright "does not attach to the underlying musical work *per se,* but only to the aural version of such work as fixed on the material object." 1 Nimmer, *supra,* § 2.10[A][2].

ment is denied without prejudice as it relates to this issue.

The Copyright Act provides that copyright ownership in a work "vests initially in the author or authors of the work." 17 U.S.C. § 201(a) (1994); *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). Generally, the author of a work is the person who "actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection." *Id.* There is an exception to this general rule applicable to "works made for hire." In the case of a work made for hire, unless there is a written agreement to the contrary, the author of the copyright is not the person who actually creates the work, but the employer or other person for whom the work was prepared. 17 U.S.C. § 201(b) (1994); *Community for Creative Non–Violence,* 490 U.S. at 737, 109 S.Ct. 2166; *Roeslin v. District of Columbia,* 921 F.Supp. 793, 797 (D.D.C.1995). It is also possible for a work to have joint authors if the work was "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101 (1994 & Supp.1999). Joint authors are co-owners of the copyright in a work. 17 U.S.C. § 201(a) (1994).

In order to determine whether RAS or Staggers owns the *New Brand Style* sound recording, the Court must decide: (1) whether McLarty or Staggers, or both jointly, created the sound recording; (2) if Staggers created the sound recording, whether it was prepared for McLarty as a work made for hire; and (3) the effect of the contract between McLarty and Staggers on ownership of the recording. Neither RAS nor Staggers claims to have registered a copyright in the *New Brand Style* sound recording with the Copyright Office; thus, neither party may benefit from the presumption that it owns the copyright. *See* 17 U.S.C. § 410(c) (1994) ("In any judicial proceedings the certificate of a registration ... shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."); *Stenograph L.L.C.,* 144 F.3d at 99; *Hart v. Sampley,* 1992 WL 336496, *1 (D.D.C.1992). *See also Ballas v. Tedesco,* 41 F.Supp.2d 531, 538 (D.N.J.1999).

RAS argues that it is the owner of the copyright because: (1) plaintiff did not perform the music on the album in any traditional sense, as he created the music on his computer; and (2) McLarty, as producer of the album, paid for the studio time, the tapes, and all other aspects of the recording and manufacturing of the sound recording.[7] RAS has not established as a matter of law that McLarty, and McLarty alone, created the recording. First, RAS does not explain why Staggers's use of a

---

7. Defendant does not cite any authority—either case law or statutory—for its argument that it owns the sound recording copyright, other than to state that "under industry standards and the law, the record company is the owner of the copyright in the sound recordings." Pl.'s Reply, ¶ 21. RAS correctly points out that, under industry standards, the record company, rather than the artist, owns the sound recording. *See* 5 Nimmer, *supra,* § 24.03[A] ("A typical recording agreement between a record company and a performer will provide that the record company ... is the sole copyright owner of all results and proceeds of the performer's recording services...."). However, RAS fails to mention that this is so because record companies typically include an express transfer provision in their recording contracts with artists stating that the record company will own the sound recording copyright. *See id.* at Form 24–10 (providing an excerpt from a typical recording agreement that states, in relevant part, "You [Artist] warrant, represent and agree that throughout the Territory, [Record] Company is the sole, exclusive and perpetual owner of all Masters delivered hereunder or recorded by Artist during the term of this agreement, which ownership entitles Company, among other things, to all right, title and interest in the copyright in and to the Masters (but excluding the copyrights of the musical compositions contained therein).") In this case, RAS had no direct agreement with Staggers at all. Moreover, the contract between McLarty and Staggers contained no provision stating who owned the sound recording copyright.

computer to create the music for the recording makes it any less a "performance" than if he had used some other, more traditional instrument.[8] Second, paying for the recording, without more, is not sufficient to establish McLarty's authorship of the recording. *See Forward v. Thorogood*, 985 F.2d 604, 605–606 (1st Cir. 1993) (finding that plaintiff was not joint author of sound recording where he had arranged and paid for the recording session and requested that specific songs be recorded, but did not make any musical or artistic contribution to the recording, such as serving as the engineer or directing the manner in which the songs were played or sung). *See also* 1 Nimmer, *supra,* § 2.10[A][2][b] ("If the act of 'setting up the recording session' were the record producer's only basis for claiming original contribution to the recording, and hence 'authorship,' it would be ill-based indeed. This is no more an act of 'authorship' than is the act of one who makes available to a writer a room, a stenographer, a typewriter, and paper.").

■ It is not clear from the facts pleaded thus far how much involvement McLarty had in creating the *New Brand Style* sound recording. While it is undisputed that McLarty created the original concept for the album, hired Staggers to write, arrange, and perform the music, and paid for the studio time, this may not be sufficient to establish either his sole or joint authorship of the sound recording. *See, e.g., Forward,* 985 F.2d at 605–606; *Ballas,* 41 F.Supp.2d at 540 (finding that plaintiff was not joint author of the sound recording where his only contribution to the sound recording was the original idea). *But cf. Shaab v. Kleindienst,* 345 F.Supp. 589, 590 (D.D.C.1972) (stating that providing the equipment and organizing the diverse talents of arrangers, performers, and technicians, are activities satisfying the 1909 Copyright Act's requirements of authorship); H.R.Rep. No. 94–1476 at 56 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659 (stating that the acts of "setting up the recording session, capturing and electronically processing the sounds, and compiling and editing them to make the final sound recording" may constitute authorship of a sound recording).

Finally, even if McLarty's creative contributions to the sound recording were substantial, he and Staggers may be joint authors of the work. *See Systems XIX, Inc. v. Parker,* 30 F.Supp.2d 1225, 1228 (N.D.Cal.1998), quoting United States Copyright Office, Compendium of Copyright Office Practices § 495.01 at 400–37 (noting that both the performer and the record producer usually contribute to the authorship of a sound recording); 1 Nimmer, *supra,* § 2.10[A][3] ("Absent an employment relationship, or an express assignment of copyright from the performers to the record producer, the resulting ownership of the sound recording copyright will either be exclusively in the performing artists, or . . . a joint ownership between the record producer and the performing artists."). Just as with McLarty, the exact nature of Staggers's role in creating the *New Brand Style* sound recording is not clear from the facts pleaded thus far. However, it is undisputed that he performed and recorded the music for the sound recording in some fashion. Thus, the Court does not have enough information about McLarty's and Staggers's respective roles in creating the sound recording at this stage to determine which of the two, if not both jointly, is its "author" within the meaning of the Copyright Act.

■ Nor does RAS provide evidence that Staggers created the work for McLarty as a "work made for hire." The Copyright Act defines a "work made for hire" as either: (1) a work prepared by an employee within the scope of his employment; or (2) a work specially ordered or commis-

8. Plaintiff states that he created the music for the recording through a computer that was linked to musical equipment. Pl.'s Dep., p. 15, lines 7–10. Thus, plaintiff essentially used the computer as his musical instrument. *Id.* at lines 12–14.

sioned for use as one of the following: a contribution to a collective work, a part of a motion picture or other audiovisual work, a translation, a supplementary work, a compilation, an instructional text, a test, answer material for a test, or an atlas. 17 U.S.C. § 101 (1994 & Supp.1999); *Community for Creative Non–Violence,* 490 U.S. at 738, 109 S.Ct. 2166. Because a sound recording does not fit within any of the nine categories of "specially ordered or commissioned" works, whether it was made for hire depends on whether Staggers was McLarty's employee and prepared the sound recording within the scope of that employment. *See Lulirama Ltd. v. Axcess Broadcast Services, Inc.,* 128 F.3d 872, 878 (5th Cir.1997) (finding that sound recordings are not included within any of the § 101(2) categories); *Ballas,* 41 F.Supp.2d at 541 (noting that a sound recording does not fall within § 101(2)). In determining whether a hired party is an employee within the meaning of § 101, a court must look to the general common law of agency. *See Community for Creative Non–Violence,* 490 U.S. at 740, 109 S.Ct. 2166; *Roeslin,* 921 F.Supp. at 797. The Court does not have sufficient information at this time to determine as a matter of law whether Staggers was McLarty's employee or whether he was an independent contractor.[9]

Finally, the Court finds that, contrary to plaintiff's argument, the contract between him and McLarty is not dispositive of who owns the copyright in the sound recording. Plaintiff claims that he is the owner of the copyright because, pursuant to paragraph four of his agreement with McLarty, he retained his copyright in the *New Brand Style* sound recording. The Court disagrees. The contract provision that plaintiff proffers as evidence of his copyright ownership of the sound recording states only that he was to "retain all Copyrights and Publishing to the music of the aforementioned compositions." *See* Pl.'s Opp'n, Ex. 1, ¶ 4. By these terms, plaintiff retained only the copyrights in the musical compositions for the *New Brand Style* album, not the sound recording copyright. The next sentence of the paragraph confirms this interpretation, as it refers to plaintiff's obligation to issue mechanical licenses to RAS for use of the musical compositions. So-called "mechanical licenses" refer only to licenses in musical compositions, not in sound recordings.[10] *See* 2 Nimmer, *supra,* § 8.04[A]. Thus, the contract between McLarty and Staggers does not specify who was to own the sound recording copyright.[11]

In sum, the Court does not have sufficient information to determine whether

9. The Court would consider the following factors in making this determination: (1) McLarty's right to control the manner and means by which the sound recording was made; (2) the skill that was required to make the sound recording; (3) the source of Staggers's instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between Staggers and McLarty; (6) whether McLarty had the right to assign additional projects to Staggers; (7) the extent of McLarty's discretion over when and how long plaintiff worked; (8) the method by which Staggers was paid; (9) McLarty's role in hiring and paying Staggers's assistants; (10) whether creating sound recordings was part of McLarty's regular business; (11) whether McLarty was in business; (12) whether McLarty provided Staggers with employee benefits; and (13) Staggers's tax treatment. *See Community for Creative Non–Violence,* 490

U.S. at 751, 109 S.Ct. 2166. No one of these factors would be determinative. *Id.*

10. Compulsory licenses for the use of musical compositions are often referred to as "mechanical licenses" as the provision of the Copyright Act that provides for them—17 U.S.C. § 115—allows the act of "mechanically" recording a song on fixed media, such as a phonograph record or piano roll. *See* 2 Nimmer, *supra,* § 8.04[A].

11. Implicit in plaintiff's claim that he "retained" the copyright in the sound recording is the assumption that plaintiff was the initial owner of this copyright. As discussed above, neither plaintiff nor defendant has provided sufficient information thus far to prove their authorship of the sound recording copyright. Thus, plaintiff's assumption may or may not be true.

RAS is the sole or joint owner of the sound recording copyright for the *New Brand Style* album. The parties' contract does not provide who was to own the copyright. McLarty's and Staggers's respective contributions to creating the sound recording are not fully known at this time. Similarly, the nature of the relationship between McLarty and Staggers is unclear. As a result, the Court cannot decide that, as a matter of law, RAS did not infringe plaintiff's alleged copyright in the *New Brand Style* sound recording. Accordingly, defendant's motion for summary judgment on this issue is denied without prejudice.

## 2. Whether RAS Infringed Plaintiff's Alleged Copyrights in the Twelve Songs on the *New Brand Style* Album

The Court next addresses plaintiff's claim that defendant knowingly infringed plaintiff's copyrights in plaintiff's musical compositions by publishing and placing on the market the *New Brand Style* album. This set of allegations pertains to the twelve musical compositions on the album, and not the sound recording. RAS does not dispute that plaintiff is the copyright owner of the eleven songs he wrote for the *New Brand Style* album. Nor does RAS dispute that, before January 30, 1997, it distributed the album. However, RAS claims that it has licenses to manufacture and distribute plaintiff's eleven songs, and therefore it has not infringed plaintiff's copyrights. Also, RAS argues that plaintiff is not the copyright owner of *Mi Name Tiger*, the song written by Tilkens. Considering the evidence in the light most favorable to plaintiff, the Court assumes for the purposes of this motion that McLarty lacked the proper authority to grant RAS the license to publish plaintiff's music because, pursuant to their contract, plaintiff retained those rights.

### a. Whether RAS infringed plaintiff's alleged copyrights in the eleven songs written by plaintiff

■ Plaintiff claims that when he became aware that RAS was distributing a record containing his musical compositions, allegedly without his authorization, he notified RAS either to stop or to arrange proper licensing. *See* Compl., Ex. G. After RAS was informed that it was potentially infringing plaintiff's copyrights, it negotiated eleven licenses with plaintiff's agent (the Harry Fox Agency). *See* Def's Mot. for Summ.J., Ex. 5. The licenses expressly provide RAS with the authority to manufacture and distribute the eleven songs written by plaintiff for the *New Brand Style* album within the United States. *See id.* Plaintiff admits in his deposition that these licenses were issued to RAS with his authorization. *See* Pl.'s Dep., p. 39, lines 7–11. Plaintiff's grant of the eleven licenses bars him from asserting that RAS violated his copyrights in these musical compositions during the period the licenses were in effect. *See I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 (7th Cir.1996) (noting that the existence of a license creates an affirmative defense to a claim of copyright infringement); *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 559 (9th Cir.1990) (noting that, by granting a license, the licensor gives up the right to sue the licensee for copyright infringement). Thus, to the extent RAS manufactured and distributed plaintiff's eleven songs within the United States during the time period the licenses were in effect, it did not infringe plaintiff's copyrights.[12]

Plaintiff and defendant have different ideas about when the licenses were in effect. While there seems to be no disagreement on when the licenses were issued, the parties sharply disagree on when, if at all,

---

12. The parties did not address whether the eleven licenses essentially "cured" defendant's potential liability for alleged infringement prior to the grant of the licenses. Having no evidence presented by the parties on the matter, the Court may not decide this issue as a matter of law and, therefore, the Court's decision today does not affect this particular issue.

the licenses were terminated. Plaintiff argues the licenses were terminated by a letter his attorney sent RAS on October 6, 1996, or, in the alternative, by his service of the complaint on RAS on January 6, 1997. Thus, plaintiff argues that RAS's failure to pay royalties on the albums distributed after the date the licenses were terminated violated his copyrights. Defendant claims the licenses have never been effectively terminated, and therefore, its distribution of the *New Brand Style* album after those dates could not have violated plaintiff's copyrights.

The Copyright Act provides for the termination of compulsory licenses in the event the licensee does not pay the copyright owner the required royalties. Specifically, if the copyright owner does not receive his royalties when due, he may give written notice to the licensee that, unless the default is remedied within thirty days from the date of the notice, the compulsory license will be automatically terminated. *See* 17 U.S.C. § 115(c)(6) (1994 & Supp.1999). Such termination renders the making or the distribution of all phonorecords for which royalties have not been paid actionable as acts of infringement under § 501. *See id.* In addition, the license agreements between RAS and plaintiff essentially repeated this statutory language, providing that:

> In the event you fail to account to us and pay royalties as herein provided for, said Publisher(s) or his Agent may give written notice to you that, unless the default is remedied within 30 days from the date of the notice, this compulsory license will be automatically terminated. Such termination shall render either the making or the distribution, or both, of all phonorecords for which royalties have not been paid, actionable as acts of infringement under, and fully subject to the remedies provided by, the Copyright Act.

Def's Mot. for Summ.J., Ex. 6.

Plaintiff puts forth two alternative arguments as to how and when he notified RAS of his intent to terminate the licenses: (1) by an October 3, 1996, letter notifying RAS of plaintiff's intent to file a lawsuit; or (2) by serving defendants with the complaint in this matter on January 6, 1997. Thus, according to plaintiff, the licenses were automatically terminated 30 days after his notification—on either November 2, 1996, or February 6, 1997, respectively—pursuant to paragraph four of the license agreements. Defendant argues that neither the letter nor the complaint constituted effective notice of plaintiff's intent to terminate the licenses and, as a result, the licenses were never terminated. In the alternative, defendant argues that, even if the serving of the complaint did constitute effective notice of plaintiff's intent to terminate the licenses, it did not distribute any *New Brand Style* albums after the licenses were terminated.

■ On October 3, 1996, plaintiff's attorney sent a letter notifying RAS that plaintiff intended to file a lawsuit concerning the music he wrote for the *New Brand Style* album and briefly describing the nature of plaintiff's claims. *See* Pl.'s Opp'n., Ex. 4. Plaintiff claims that this letter was sufficient to put RAS on notice that the licenses would be terminated, and therefore, any records distributed after November 2, 1996, infringed his copyrights. The Court concludes that this letter failed to provide adequate notice to automatically terminate the licenses. As discussed above, the license agreements call for written notice that "unless the default [in royalty payments] is remedied within 30 days from the date of the notice, this compulsory license will be automatically terminated." Def.'s Mot. for Summ.J., Ex. 6. While the letter discusses the failure to pay royalties as a basis for a potential lawsuit, it contains no language notifying RAS of any intent to terminate the licenses unless the failure to pay is remedied. On the contrary, it seeks to encourage negotiations between the two parties under the existing license agreements.

■ Second, and in the alternative, plaintiff claims that the filing of this lawsuit was reasonable notice that he intended to terminate the licenses. However, as with the October 3, 1996, letter, the complaint does not state that, unless the default is remedied within 30 days, the licenses will be automatically terminated. Although the complaint alleges, *inter alia,* defendant's failure to pay plaintiff adequate royalties, it does not contain any language purporting to terminate RAS's compulsory licenses as a result of this failure. Nor does it allege that RAS's licenses have been terminated or refer in any other way to the termination of licenses. Thus, the Court concludes that the complaint does not constitute adequate notice of plaintiff's intent to terminate the licenses.[13] In addition, the Court notes that plaintiff admits that neither he nor his attorney provided RAS with the notice called for in the license agreements, either by means of a letter or any other kind of correspondence. *See* Pl.'s Dep., p. 99, lines 1–4. Thus, because plaintiff did not provide RAS with proper notice of its intent to terminate the compulsory licenses, the licenses were never effectively terminated. Accordingly, once RAS obtained the licenses in plaintiff's eleven songs, at no time afterward could it have violated plaintiff's copyrights in those songs by distributing the *New Brand Style* album within the United States.

Moreover, even if the Court had found the complaint was effective notice of plaintiff's intent to terminate the licenses, plaintiff has not provided any intelligible evidence that RAS distributed the album after the termination date. Regardless of whether RAS's licenses in plaintiff's songs were terminated, if it did not distribute any albums after the purported termination date, it could not have violated plaintiff's copyrights. Plaintiff served defendant with the complaint on January 6, 1997. If the complaint was effective notice of plaintiff's intent to terminate the licenses, then according to the terms of both the licenses and the Copyright Act,

---

**13.** Plaintiff cites *Peer Int'l Corp. v. Luna Records, Inc.,* 887 F.Supp. 560 (S.D.N.Y.1995), in support of his argument that the filing of this lawsuit constituted notice of his intent to terminate the licenses. Like this case, *Peer* involved the issue of when a copyright owner in musical compositions has given adequate notice under the Copyright Act of his intent to terminate the licensee's compulsory licenses for nonpayment of royalties. In *Peer,* the Court stated that plaintiff's commencement of the lawsuit "should have resolved any doubts defendants might have had concerning whether plaintiffs intended to terminate the licenses." *Id.* at 566. While at first blush this case appears to support plaintiff's argument, upon closer reading, the *Peer* case is distinguishable on its facts from this case. Unlike the plaintiff in this case, prior to filing their complaint, the *Peer* plaintiff's had sent the defendant a letter expressly stating that termination of the licenses would occur unless the default in royalty payments was remedied within 30 days. *Id.* at 563. The *Peer* court found that this letter provided defendant with notice of plaintiff's intent to terminate the licenses. *Id.* at 566. The court noted that the filing of the suit should have resolved any doubts about plaintiffs' intent to terminate the licenses merely in response to defendant's claim that, despite having received this letter, it was not aware of plaintiffs' intent because the parties were still in negotiations. *Id.* Thus, *Peer* does not stand for the proposition that, as a general rule, the commencement of an infringement lawsuit constitutes notice to a defendant of the plaintiff's intent to terminate compulsory licenses. Its much more limited holding is merely that, where a plaintiff has already sent express notice of its intent to terminate compulsory licenses and, due to ongoing negotiations, the defendant is unsure whether the letter reflects plaintiff's actual intent, the filing of the lawsuit demonstrates that the plaintiff's actual intent is in fact to terminate the licenses. As a result, *Peer* does not support plaintiff's argument. Plaintiff's complaint did not provide RAS with the sort of explicit notice of its intent to terminate the licenses that was provided by the plaintiffs' letter in *Peer.* While the complaint admittedly may have caused RAS to question the status of its licenses (in that it alleges, *inter alia,* defendant's failure to pay plaintiff adequate royalties) it does not expressly state that the licenses will be automatically terminated within 30 days if the default in royalty payments is not remedied. As plaintiff could have quite easily sent the express notice of its intent called for by the license agreements, it is not appropriate to ask defendant to guess as to plaintiff's intent.

the licenses would have been automatically terminated on February 6, 1997, 30 days after RAS received notice. However, on January 31, 1997, several days before plaintiff's purported termination of the licenses, the parties entered into a joint stipulation in which RAS agreed not to publish, perform, produce, market, or otherwise dispose of any copies of the *New Brand Style* album not previously shipped. Gary Himmelfarb, president of RAS, submitted an affidavit in which he "verified that no further sale of the album *New Brand Style,* or any songs contained therein, by this or any other name, was made after January, 1997." Himmelfarb Aff., ¶ 2, Def's Mot. for Summ.J., Ex. 8.

■ Plaintiff points to RAS's shipping logs and to a purchase order he placed with an Internet "record store" as evidence that the record was distributed after the licenses were terminated. The mere fact that an Internet "record store" actually sold the record is not sufficient to show that RAS is responsible for distributing any of those records after its licenses were terminated. Plaintiff provides no evidence that these "stores" are at all connected with defendant, or that any of these records were actually made or distributed after the license was terminated. In contrast, RAS's president testified in his deposition that RAS has no relationship with the Internet companies referenced by plaintiff. Himmelfarb Dep., pp. 9–12. Plaintiff also points to RAS's shipping logs as evidence that RAS distributed plaintiff's compositions after the license was terminated. Plaintiff, however, fails to explain the meaning, significance, or authenticity of the material furnished to the Court. A plaintiff who is opposing a properly supported summary judgment motion must set forth "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *FDIC v. Bender,* 127 F.3d 58, 63 (D.C.Cir.1997). The logs provided are inconclusive at best. Thus, it appears that, even if plaintiff's complaint was effective notice of termination, which it was not,

plaintiff has not demonstrated that there is a genuine factual issue as to whether the *New Brand Style* album was distributed after the licenses' purported termination date.

**b. Whether RAS infringed plaintiff's alleged copyright in *Mi Name Tiger***

Both parties agree that RAS never had a license to publish, or otherwise distribute, the composition *Mi Name Tiger.* Defendant, however, argues that plaintiff is not entitled to institute any legal action regarding this song because plaintiff is not the copyright owner. Conversely, plaintiff argues that the author of that song, Tilkens, assigned to plaintiff all of his publishing rights in the composition.

■ As author of the song, the copyright to *Mi Name Tiger* vested initially in Tilkens. *See* 17 U.S.C. § 201(a) (1994). In order to have validly transferred his copyright in the song to Staggers, Tilkens must have done so in writing. *See* 17 U.S.C. § 204(a) (1994) ("[A] transfer of copyright ownership ... is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."); *Konigsberg Int'l, Inc. v. Rice,* 16 F.3d 355, 357 (9th Cir.1994) ("[A] transfer of a copyright is simply 'not valid' without a writing.").

In this case, plaintiff admits that he obtained the rights to *Mi Name Tiger* by means of a verbal agreement with Tilkens, and not via a written agreement. *See* Pl.'s Dep., p. 20, lines 17–19; p. 21, lines 1–6; p. 41, lines 4–12. Thus, Tilkens did not validly transfer his rights to Staggers. Plaintiff argues that, pursuant to § 410(c) of the Copyright Act, the copyright certificate he has presented to the Court constitutes prima facie evidence of the validity of his copyright in *Mi Name Tiger. See* 17 U.S.C. § 410(c); *Stenograph L.L.C.,* 144 F.3d at 99; *Hart,* 1992 WL 336496 at *1. *See also Broadcast Music, Inc. v. Rockingham Venture, Inc.,* 909 F.Supp. 38, 43

(D.N.H.1995). While the certificate does create a presumption that the copyright is valid, plaintiff's admissions rebut this presumption.

In cases like this one, where the non-moving party bears the burden of proof at trial on a dispositive issue, "a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(c)). Because plaintiff admits that he has not followed the statutory requirements to obtain a copyright in *Mi Name Tiger,* and there is no contemporaneous written transfer of copyright ownership, nor any indication in the record, through an affidavit or otherwise, that Tilkens in fact granted plaintiff the alleged "publishing rights," plaintiff has no valid copyright claim to the song. Accordingly, as it relates to this particular issue, defendant's motion for summary judgment is granted.

## B. *The Overseas Distribution of Plaintiff's Music*

Plaintiff's complaint next claims that RAS signed licenses to reproduce plaintiff's music outside of the United States in violation of the license agreements. This claim refers to RAS's grant of licenses to reproduce the *New Brand Style* sound recording to overseas companies. Plaintiff's opposition to defendant's motion added another, similar claim: that RAS infringed his copyrights in his musical compositions and violated the license agreements by distributing albums that it manufactured in this country outside of the United States.[14]

## 1. RAS's Grant of Licenses in the Sound Recording

RAS acknowledges that it granted foreign companies the right to reproduce the *New Brand Style* sound recording. However, RAS argues that, as copyright owner

of the sound recording, it was fully authorized to license the right to reproduce the recording to whomever it pleased. Such licensee would then be responsible for obtaining the rights and paying royalties to plaintiff for the use of his musical compositions.

■ The obvious limitation of RAS's argument is that the ownership of the *New Brand Style* sound recording copyright has not yet been established. If RAS does in fact own the copyright, its arguments are correct. However, if Staggers owns the copyright, RAS's actions may have violated his copyright. Because determining the ownership of the sound recording copyright is a prerequisite to resolving this issue, defendant's motion for summary judgment must be denied without prejudice as it relates to it. However, defendant's motion is granted to the extent that plaintiff claims that RAS's grant of licenses in the sound recording violated the license agreements. The license agreements by their terms covered only plaintiff's copyrights in his musical compositions, not use of the *New Brand Style* sound recording. As a result, RAS's grant of rights in the sound recording could not have violated the license agreements.

## 2. RAS's Alleged Foreign Distribution of Albums Manufactured in the United States

■ RAS's licenses to distribute plaintiff's songs are expressly limited to distribution within the United States. *See* Def's Mot. for Summ.J., Ex. 5 ("The authority hereunder is limited to the manufacture and distribution of phonorecords solely in the United States, its territories and possessions and not elsewhere."). As discussed above, plaintiff alleges that RAS violated the license agreements and his copyrights by distributing *New Brand Style* albums manufactured in this country

---

**14.** Because plaintiff's complaint does not include this claim, if plaintiff wishes to pursue

it further, he must amend his complaint to include it.

outside of the United States. In response to plaintiff's allegation, defendant argues only that plaintiff "offers no basis for his claim that RAS is in violation of its license[s] other then to state the record appears in foreign markets." Def's Mot. for Summ.J., ¶ 52.

The Court disagrees with defendant's argument. Plaintiff has presented the Court with sufficient evidence that RAS may have distributed domestically-manufactured copies of the *New Brand Style* album outside of the United States. The president of RAS Records, Himmelfarb, admits that RAS used a Dutch company, CRS, to distribute the *New Brand Style* album overseas. Himmelfarb Dep., p. 35–36, lines 20–22 & 1–15; p. 16, lines 5–7. Himmelfarb also admits that CRS received more than 713 copies of the album. *See id.* at p. 16, lines 4–17. In addition, through an importer, plaintiff purchased from a German source a *New Brand Style* compact disc that appears to have been manufactured in the United States. *See* Pl.s Opp'n, Exs. 17 & 18, ¶ 6. The compact disc plaintiff purchased has a sticker on the label that states "Made in Germany," but the print on the compact disc itself states "Manufactured and distributed by RAS Records, Washington, DC." *See id.* Thus, a genuine issue of material fact exists with respect to whether RAS distributed *New Brand Style* albums manufactured in the United States to foreign companies. Accordingly, defendant's motion for summary judgment is denied with respect to plaintiff's claim that RAS violated the license agreements and his copyrights by distributing domestically-manufactured copies of the *New Brand Style* album outside the United States.

### C. *Contract Claim*

#### 1. Subject Matter Jurisdiction

Defendant claims that this Court does not have jurisdiction to resolve the remaining contract issues in this case, and that it must therefore dismiss the action in its entirety. Defendant claims that the issues presented do not involve a federal question, because the copyright infringement claims presented by plaintiff must be dismissed. Defendant contends that plaintiff's claim arises under contract law and that because plaintiff could not possibly meet the federal jurisdictional threshold for diversity actions, the Court must dismiss the case.

■ Defendant's argument is flawed for the following reasons. First, as discussed above, plaintiff's copyright claim presents several genuine issues of material fact. Second, even if defendant's motion were granted as to all the copyright claims, whether a complaint arises under copyright law is determined by the well-pleaded complaint rule. "Whether a case is one arising under ... a law ... of the United States ... must be determined from what necessarily appears in the plaintiff's statement of his own claim in the [complaint], unaided by anything alleged in anticipation of avoidance of defenses...." *Franchise Tax Bd. v. Construction Laborers Vacation Trust,* 463 U.S. 1, 9, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (quoting *Taylor v. Anderson,* 234 U.S. 74, 75–76, 34 S.Ct. 724, 58 L.Ed. 1218 (1914)) (internal brackets omitted). Unless the alleged claim "clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction" or is "wholly insubstantial and frivolous," plaintiff's well-pleaded complaint determines whether the suit arises under the laws of the United States for jurisdictional purposes. *Bell v. Hood,* 327 U.S. 678, 682–83, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Plaintiff's copyright claims were substantial and non-frivolous; thus, even if all of the copyright claims were dismissed, the Court has the discretion to retain or decline jurisdiction over plaintiff's supplemental contract law claims. *See* 28 U.S.C. § 1367(c)(3) (1994); *Stevenson v. Severs,* 158 F.3d 1332, 1334 (D.C.Cir.1998).

## 2. Royalty Dispute

Finally, the Court denies summary judgment on the royalty issue because it concludes that a genuine issue of material fact exists as to the amount, if any, that defendant owes plaintiff for payment of royalties or damages in general. Defendant insists that this Court does not have jurisdiction over plaintiff's claim, and therefore only addresses the damages issue summarily. Defendant has the burden to show the Court that there exists no genuine issue of material fact, or that the plaintiff has failed to support one of the essential elements of his claim. *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548. Defendant has failed to meet that test, and thus its motion for summary judgment is denied as to this issue.

## CONCLUSION

For the foregoing reasons, defendant's motion is granted in part and denied in part. An appropriate Order accompanies this Opinion.

## *ORDER*

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that defendant's motion for summary judgment is granted in part and denied in part. It hereby further is

ORDERED, that defendant's motion for summary judgment is granted with respect to plaintiff's claims that defendant violated plaintiff's copyrights by: (1) publishing the eleven songs written by plaintiff during the time period that it held a license to do so; and (2) publishing the song *Mi Name Tiger.* It hereby further is

ORDERED, that defendant's motion for summary judgment is also granted with respect to plaintiff's claim that defendant's grant of licenses to reproduce the *New Brand Style* sound recording violated the parties' license agreements. It hereby further is

ORDERED, that defendant's motion for summary judgment is denied without prejudice with respect to plaintiff's claims that defendant: (1) infringed plaintiff's alleged copyright in the sound recording of the *New Brand Style* album; (2) infringed plaintiff's copyrights in his musical compositions by distributing the *New Brand Style* album outside the United States; and (3) breached the license agreements by not paying plaintiff adequate royalties.

**SO ORDERED.**